Mark HAWLEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2013–CA–001163–MR.

Court of Appeals of Kentucky.

June 13, 2014.

Gene Lewter, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General of Kentucky, Christian K.R. Miller, Assistant Attorney General, Frankfort, KY, for Appellee.

Before LAMBERT, MAZE and MOORE, Judges.

## OPINION

LAMBERT, Judge:

Mark Hawley has appealed from the judgment of the Madison Circuit Court convicting him of manufacturing methamphetamine and possession of a controlled substance, and sentencing him to a total of twelve years in prison. Hawley entered a conditional guilty plea that permitted him to appeal the circuit court's ruling on his motion to suppress. Finding no error in the circuit court's ruling, we affirm the judgment.

In November 2012, the Madison County grand jury indicted Hawley on three charges: manufacturing methamphetamine pursuant to Kentucky Revised Statutes (KRS) 218A.1432; first-degree possession of a controlled substance pursuant to KRS 281A.1415; and for being a second-degree persistent felony offender (PFO II) pursuant to KRS 532.080. The charges arose from events on August 22, 2012, when Hawley was found to be in possession of methamphetamine and of two or more chemicals or items of equipment with the intent to manufacture methamphetamine. The Madison County Sheriff's Department found a lab in the garage of a residence where Hawley was located, items used to manufacture methamphetamine, and suspected methamphetamine in a jar. Hawley was arrested and charged with offenses related to these discoveries.

Hawley filed a motion to suppress all of the evidence collected during the search of the house and garage. He stated that the officers entered and searched his home and garage without a warrant and argued that the circumstances of the search did not meet any of the exceptions to the warrant requirement.

The court held a suppression hearing on March 19, 2013. The first witness to be called was Detective Jasper White, who is a detective and deputy sheriff with the Madison County Sheriff's Department. He was working and on duty on August 28, 2012, when he learned from Detective Parker that an anonymous tip had been received about an address on Richmond Road in Berea, Kentucky. He and Detective Parker responded to the tip. When they pulled up to the residence and into the driveway, Detective White detected a strong chemical odor to the north side of the garage, which was attached to the house. He saw a plastic bottle that appeared to have been used as an HCl generator in the manufacture of methamphetamine. The garage had two doors; one door was closed and the other one was open. No one was in the garage when they looked inside.

Detective White and Detective Parker went to the partially open door of the house and announced themselves, but no one answered when they knocked several times. They entered the house to ensure the safety of anyone who might be inside because it was not uncommon for residents to become asphyxiated due to the toxic gases. They cleared the house, but they did not search the house at that time. The detectives found Hawley behind a bathroom door and brought him outside. After telling him why they were there, Hawley told the detectives that he was there to wash clothes in the garage. He said his

grandfather lived there, but that he had gone into town. Hawley denied knowing what was going on. Detective White saw Vicki Hawley, the appellant's mother, when she came to the scene after they had found Hawley but before he had conducted the search and collected any evidence. Detective White told Ms. Hawley why he was there and that there were meth labs in the garage. Ms. Hawley stated that Hawley knew his grandfather did not live at the residence, but lived with her. She was the administrator of the property and had dropped Hawley off earlier to do his laundry. Ms. Hawley wanted them to search the whole house to ensure nothing else was there.

On cross-examination, Detective White stated that when he exited the vehicle, he could see a pop bottle on the flower pot and that it was obvious what it was because part of the bottle had degraded and he could see the salts used in creating the HCl generator in the flower pot. When he looked into the open door of the garage, Detective White saw a jar with liquid in it, as well as other items, that he suspected were used in the manufacturing process. However, his primary motivation for looking in the garage was to look for people and get them out of the area, not to look for items. Detective White did not remove any items from the garage until other officers brought the meth decontamination trailer to the scene thirty or forty minutes later. He stated that there were two tables in the garage; one had drug paraphernalia on it and the other had two meth labs, an air respirator, and other items on it. A sprayer and a three gallon container were on the floor, and he did not see those until he went inside of the garage.

Detective White stated that he had not called Ms. Hawley before she arrived at the scene. He did not ask Hawley for consent to search because he said he did not live at the residence. Detective White requested that Hawley contact his grandfather for permission, but Hawley refused and said he would be back in a few minutes. Detective White told Ms. Hawley when she arrived that he suspected there was a meth lab in the garage. She asked him to search the house to make sure nothing else was in there.

The next witness to testify was Vicki Hawley, who is Hawley's mother. She was the owner of the subject property in August of 2012. The property had belonged to her father until he gave it to her. No one lived there, but she went to the property every other day due to break-ins. She had Hawley stay at the house for a night or two after he mowed the lawn. She had been in the house and garage the prior day, but she had not noticed any odors. She took Hawley to the house around noon to mow the lawn, work in the house, and wash his clothes. Ms. Hawley was contacted by the sheriff's office or the state police and told to come to the property. Once she arrived, several officers were present, and she learned that the officers had found a meth lab in the garage. Hawley had already been handcuffed and was by the truck. She spoke to Detective White, who asked who owned the house. The officers asked for permission to search, and she got upset and asked why they needed to search because they had already arrested Hawley. She did not understand why they needed her permission to go in the house after they had already been inside the house and the garage, without her permission. They told her they needed her permission to go in, and she told them, "I guess you have to do whatever they had to do." The officers told her that they could get a search warrant if she said no. She did not respond to this statement because another person approached at that time. She did not remember sign-

ing anything giving the officer permission to search the house.

On cross-examination, Ms. Hawley stated that her father had not lived there for about one year. He was staying with her after a surgery. Hawley knew his grandfather was no longer living there, as Hawley lived at her house and helped out with the care of his grandfather. She denied asking Detective White to search the property, but she told her son to tell them if anything was going on. On redirect examination, she stated that several officers were in the vicinity when she was asked about searching the house. She never gave them permission to search. When they told her they could go get a search warrant if she said no, she said, "well just do whatever you have got to do is all I can say."

At the conclusion of the testimony, Hawley requested permission to brief the issues, which the court permitted his counsel to do. The court went on to make several factual and legal findings on the record:

> This is a case of clearly a person has a reasonable expectation of privacy in their home and to have a warrantless search we have several exceptions, and in this case we actually have several of those exceptions for a warrantless search. If you want, I hate to preclude you from looking into this because right now I am not really leaning towards suppressing anything. It appears to me that 1) the officer arrived, he smelled, is trained in the area, he smelled what he believed to be the odor of an active meth lab. He saw this bottle, I mean clearly it is not a pop bottle any longer. It is plain and clear that [it] is being used for the purpose of the manufacture of methamphetamine. You couple that with the smell, you look in the garage and see items you believe are in plain view, clearly part of a meth lab, knock on the door, the door is partially open. He certainly has probable cause to believe that there is contraband of a meth lab either in the garage or the house and goes in for a safety check, which really at that point probably would be remiss had he not done that. Goes in, finds the defendant hiding behind the door, and they leave. You can look in the next exception as the plain view. The garage door is wide open, and in plain view there are items clearly items being possible meth lab items, and then the final exception is consent. When Ms. Hawley arrived, albeit her story is perhaps that she is now saying that she didn't give full consent, based upon what the officer said and even her version, I believe she did give consent to allow that search. And so we hit yet a third exception to a search warrant, is consent. Now the part about saying that we could get a search warrant, clearly officers cannot threaten that to force someone to give consent. However, they can tell them if they have reasonable grounds and there's certainly at that point probable cause to get a search warrant to support a search warrant had they gone to get one, so I don't believe that was a threat . . . made to intimidate her to give consent. That is just a fact. They had enough evidence at that point, when you couple it with items outside clearly even with the salts in them, the smell, and the open garage door with the items that you could see. [I] just don't believe that there is any reason to suppress the methods in which this was done. So unless [Hawley's counsel] finds something different in the near future, unless I change my mind, that is really how I am looking at this case.

The same day, the circuit court entered a calendar order, stating as follows:

Testimony; Findings of fact and Conclusion of Law stated on record. Court finds officers entered house based on exigent circumstances exception and detained defendant. Items of meth lab in plain view inside open garage and outside + obvious odor, finally search of garage based on consent. Motion to suppress—denied.

On April 8, 2013, Hawley filed a brief arguing his positions related to the motion to suppress. Hawley asserted that the detectives did not have a reasonable belief that an emergency was occurring when they removed him from the house, that the chemical odor did not constitute exigent circumstances, that the plain view doctrine did not apply because the detective was not in a lawful position to view the objects he described as being used for manufacturing methamphetamine, and that Vicki Hawley's consent to search the residence was not voluntarily given. It is not clear from the record whether the circuit court reviewed these arguments or whether it reconsidered its ruling in light of the brief; there are no further orders in the record related to the motion to suppress.

On April 18, 2013, Hawley moved the court to enter a guilty plea conditioned on his right to appeal the denial of his motion to suppress. In exchange for the guilty plea, Hawley agreed to plead guilty as charged to counts 1 and 2 of the indictment, and the PFO II charge would be dismissed. The Commonwealth recommended a concurrent twelve-year sentence. The circuit court accepted his plea and later sentenced him to twelve years' imprisonment for the manufacturing methamphetamine count and to one year's imprisonment for the possession of a controlled substance charge, with the sentences to be served concurrently. The final judgment was entered on June 19, 2013, and this appeal now follows.

On appeal, Hawley contends that he was denied due process of law by the circuit court's decision to deny his motion to suppress the evidence obtained in what he describes was an improper search under the Fourth Amendment. He argues that the circuit court did not make any factual findings and that the Commonwealth failed to establish that the exigent circumstances, plain view, and consent exceptions applied in this case. The Commonwealth, in its response, argues that Hawley did not have standing to challenge the search. Alternatively, the Commonwealth contends that the warrantless search fell under multiple exceptions to the warrant requirement.

■ Our standard of review of a ruling on a motion to suppress is two-fold. First, a reviewing court must determine whether the lower court's findings of fact are supported by substantial evidence. If so, such findings are conclusive. Kentucky Rules of Criminal Procedure (RCr) 9.78; *Adcock v. Commonwealth,* 967 S.W.2d 6, 8 (Ky. 1998). Second, the court must perform a *de novo* review of those factual findings to determine whether the decision is correct as a matter of law. *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996); *Commonwealth v. Banks,* 68 S.W.3d 347, 349 (Ky. 2001); *Garcia v. Commonwealth,* 185 S.W.3d 658, 661 (Ky.App.2006); *Stewart v. Commonwealth,* 44 S.W.3d 376, 380 (Ky. App.2000).

■ This case involves the warrantless search of a residence and garage. The law in Kentucky is well-settled that "[a]ll searches without a valid search warrant are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant. The burden is on the prosecution to show the search comes within an exception." *Gallman v. Commonwealth,* 578 S.W.2d 47, 48 (Ky.1979).

Before we may reach the merits of this appeal, we shall consider the Commonwealth's argument that Hawley does not have standing to challenge the warrantless search of the garage. While this argument was not raised or considered below, the Commonwealth points out that an appellate court is permitted to affirm a lower court's judgment "for any reason supported by the record." *McCloud v. Commonwealth*, 286 S.W.3d 780, 786 n. 19 (Ky. 2009) (citation omitted).

■ In order for Hawley to bring a Fourth Amendment challenge to the search, he had to first have standing to do so.

A defendant bears the burden of establishing standing to challenge a Fourth Amendment search. *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1510 (6th Cir.1988). That burden requires proof that the defendant had a legitimate expectation of privacy in the premises. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

*Ordway v. Commonwealth*, 352 S.W.3d 584, 592 (Ky.2011). The proof in *Ordway* established that the defendant was a frequent visitor to his girlfriend's apartment, where the search took place. He did not legally reside with his girlfriend, did not have unrestricted access to the apartment, did not have a key, and did not pay the bills. The Court concluded that "no evidence was presented to establish a legitimate expectation of privacy. Therefore, Appellant cannot now complain of a Fourth Amendment violation." *Id.* The *Ordway* Court relied on the holdings in *Sussman v. Commonwealth*, 610 S.W.2d 608, 611 (Ky.1980) (appellant lacked standing to challenge search of girlfriend's apartment, though she gave him a key to the residence for limited use), and *Combs v. Commonwealth*, 341 S.W.2d 774, 775

(Ky.1961) (appellant lacked standing to challenge search of residence owned by grandfather, though he lived in the home), to support its holding. *Id.*

■ Here, we must agree with the Commonwealth that Hawley did not have standing to challenge the search because he did not have any possessory or ownership interest in the property or any expectation of privacy. Hawley told the detectives when they arrived that the residence belonged to his grandfather who was not there at the time. Ms. Hawley's testimony established that while her father (Hawley's grandfather) had owned the property where the search was conducted for many years, she in fact was the current administrator of the house, and her father lived with her and Hawley at her apartment. No one lived at the house in question, and Hawley was only there at his mother's direction to mow the yard, work in the house, and do his laundry. Hawley only occasionally stayed at the house one or two nights in the past to protect the property from break-ins. Because Hawley did not have any type of possessory interest in the house or garage, he did not have a legitimate expectation of privacy and therefore was precluded from challenging the search. Accordingly, the circuit court properly denied Hawley's motion to suppress.

Even if Hawley did have standing to assert a Fourth Amendment challenge to the warrantless search, we would nevertheless hold that the search was valid under exceptions to the warrant requirement.

■ In *Commonwealth v. Hatcher*, 199 S.W.3d 124 (Ky.2006), the Supreme Court of Kentucky addressed the constitutional protections against warrantless and unreasonable searches and seizures. The Court specifically discussed the plain view exception:

In *Hazel v. Commonwealth,* 833 S.W.2d 831, 833 (Ky.1992), this Court discussed the elements that must exist before evidence seized pursuant to the "plain view" exception may be admitted:

> First, the law enforcement officer must not have violated the Fourth Amendment in arriving at the place where the evidence could be plainly viewed. Second, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must have a lawful right of access to the object itself." Finally, the object's "incriminating character must also be 'immediately apparent.'" [*Coolidge v. New Hampshire,* 403 U.S. 443, at 466, 91 S.Ct. 2022, at 2038, 29 L.Ed.2d 564 (1971).]

*Hatcher,* 199 S.W.3d at 126. In the present case, Detective White testified about the chemical odor present when he and Detective Parker arrived at the property as well as about the plastic bottle he saw outside of the garage that he suspected was used in the manufacture of methamphetamine.

■ Similarly, the Commonwealth established that exigent circumstances existed to excuse the warrant requirement. In *Kentucky v. King,* —— U.S. ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011), the United States Supreme Court described this exception:

> One well-recognized exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); see also *Payton [v. New York], supra,* [445 U.S. 573] at 590, 100 S.Ct. 1371 [63 L.Ed.2d 639 (1980)] ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").

The Supreme Court went on to identify several exigencies that might justify a warrantless search of a home, including the emergency aid exception: "Under the 'emergency aid' exception, for example, 'officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' *Ibid.;* see also, *e.g., Michigan v. Fisher, supra,* 558 U.S. 45, at 47, 130 S.Ct. 546, at 548, 175 L.Ed.2d 410 (2009) (upholding warrantless home entry based on emergency aid exception)." *King,* 131 S.Ct. at 1856. Here, Detective White knew the danger posed by meth labs based upon his many years of experience in this field, and he entered the house and looked in the open door of the garage to determine whether anyone was inside and subject to injury due to asphyxiation or an explosion. His actions meet the exigent circumstances exception.

Finally, there is evidence to support the circuit court's finding that Ms. Hawley consented to the search based upon Detective White's testimony that she had requested that they enter the house and conduct a search, although the evidence is conflicting. In *Cook v. Commonwealth,* 826 S.W.2d 329, 331 (Ky.1992), the Supreme Court of Kentucky addressed this exception:

> Consent is one of the exceptions to the requirement for a warrant. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The test for determining if consent is constitutional is set out in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The question of voluntariness turns on a careful scrutiny of all the surrounding circumstances in a specific case.

The Court went on to state that, "[a]ll that was required to establish consent was that the consent was voluntarily given in view of all the circumstances." *Cook,* 826 S.W.2d at 331, citing *Commonwealth v. Sebastian,* 500 S.W.2d 417 (Ky.1973). While the circuit court's ruling that Ms. Hawley consented is based upon conflicting testimony, whether this ruling was correct is immaterial in light of our holdings that Hawley did not have standing to challenge the search and that the plain view and exigent circumstances exceptions applied in this case.

For the foregoing reasons, the judgment of conviction of the Madison Circuit Court is affirmed.

MOORE, Judge, Concurs.

MAZE, Judge Concurs In Result Only and Files Separate Opinion.

MAZE, Judge.

I agree with my colleagues that the judgment of the Madison Circuit Court should be affirmed. However, I concur in result only and write to express my belief that our conclusion regarding Harley's lack of standing is solely dispositive of this case. I respectfully contend that the court's additional analysis regarding the existence of exigent circumstances is superfluous and may invite unnecessary, yet reasonable, differences in opinion.